All right, our second case for this morning is GRIPUM LLC against the U.S. Food and Drug Administration, number 212840, and we will hear first from Mr. Troutman. Good morning, Your Honors. May it please the Court. The Court should vacate the FDA's marketing denial order for three reasons. First, the FDA adopted its comparative efficacy standard without notice to e-liquid manufacturers as part of its review process for premarket tobacco applications. Second, FDA's standard is really a disguised and improperly adopted tobacco product standard. And third, FDA failed to supply the metrics needed to determine whether a flavored e-liquid product was effective at promoting smoking cessation. Underlying those two reasons were two additional things that had to do with youth. FDA has misperceived the role that flavored products have in attracting youth. Mr. Troutman? Yes. Can I ask you, before you go any further, about an argument made in your reply brief where at the end you say this is an orchestrated plan to prohibit all open system products in order to raise tobacco use to increase the FDA's budget. Do you expect us to take that argument seriously? Judge, I believe in one part that one part of me wants to believe that's not true. But from what I've seen for the last nine years in dealing with this industry... So you stand by that argument? I have to stand by that argument, Judge. Okay. I think that there was something here that was going on. This was planned. That's an argument. You can proceed with your argument. Before you get too much further, I want you to discuss the standard of review because some of the things that you're talking about, such as the trade-off that the statute itself, the Tobacco Control Act, or more broadly the Family Smoking Prevention Tobacco Control Act, everybody's calling it the TCA, calls upon the FDA to balance two things. The increased likelihood that those who do not use tobacco products will start doing so, and on the other side, for any given product. You've listed pages upon pages upon pages of products. It seems to me the FDA had evidence in front of it. It has statutory standard that it's applying. You're asking us to just become the FDA and reapply it, but that doesn't seem proper under administrative law principles. Not at all, Judge Wood. What I'm asking the court to do is to require the FDA to differentiate between the two market segments. Why? The FDA has found what I'll call cross-elasticity of demand between the closed systems and the open systems, sufficient cross-elasticity of demand, that it needs to look for your open system at the likelihood that people too young to engage in this kind of, I'll just call it vaping, behavior might be induced to do it. That they're not just so wedded to the closed systems that there's no risk. If you can get rid of all the young people, then the question would be, are your products helping existing users of tobacco products stop using them? The answer there seems to be no, because you're saying that adults don't like raspberry-flavored cigarettes or whatever they are. Judge, I think to answer your question, Congress helped us a lot when it raised the age to 21. As we've seen the last two years, since that age change happened at the end of 2019, 2020 and 2021, the youth vaping rate has gone down 62%. It's now down, and this is something FDA- We don't know what the cause-effect relationship is, though, and the FDA was satisfied that there's still enough of a problem with youth evasion of these rules, let's just say. Frankly, I think one of the, I mean, for all I quite a few states by now have legalized marijuana. Maybe they're all off smoking weed instead of using tobacco products. Or vaping it. Or whatever. The marijuana issue is a total, whole separate issue among itself. But I'm just saying that the FDA looks at this evidence, and they think we still are required by the TCA to balance this. Is this product appropriate for the protection of public health? That's the statutory standard, and there's a trade-off. And don't we owe deference to the way the FDA itself has weighed those two empirical factors in the market? And I'll point the court to the FDA's final rule that it issued in October, read it for all these mark and denials, came out and became effective in November of 2021. It makes no mention of this comparative efficacy requirement that you have to look at your flavored product against your flavored tobacco product. That poses another problem. Well, the FDA didn't repeal these things. Well, yeah. I guess I'm having a similar sort of problem, Mr. Trautman, with- to the kinds of administrative decisions we see all the time. Let's say asylum requests or disability benefits requests, where the burden of proof is on the party seeking a benefit. And I understand the debate back and forth about, at least I think I understand it, about longitudinal studies and randomized clinical trials and so on. But what's the evidence that you presented to the FDA that compels a decision approving the public health benefits from your flavored products? Well, what FDA is requiring us to prove is that these are effective. That's a drug standard. It's not a tobacco standard. Appropriate for the protection of public health. Don't rephrase it. Statutory standard requires you to make a showing. What's the evidence you presented that required the FDA to rule in your favor? 2,300 plus pages of studies. And what's- right, okay. And which show that there is a difference in benefit between flavored and tobacco flavored products? That was not part of our showing, Judge, because we weren't told in advance that it had to be part of our showing. Well, isn't that pretty apparent from the statute? It says for the protection of public health. Compared to other products, too, right? But what other products? What, for instance- The ones that are being out there, that are out there being used to switch people, to try to switch people away from cigarettes. Well, and this is part of the problem. What if one of Gripham's flavors, or they have a flavor profile, they don't have a tobacco flavored product to use as a comparator? But you are pushing up against the statute. The statute defines a new tobacco product, and your fluids, whatever they are, your products are defined as a tobacco product. Correct. You can't, you know, get rid of that. We're not trying to. You can't, and the Secretary of Health and Human Services is required by this statute to deny an application to market a new tobacco product, inside the brackets, the stuff that you make, if the manufacturer, as Judge Hamilton is saying, has the burden of showing. So you have to deny if the manufacturer fails to show that the product would be appropriate for the protection of public health. And in doing so, the Secretary has to look at risks and benefits to various populations, users and non-users, and assess that. So where is your evidence so compelling that the only decision the Secretary could come to is to approve your products? Judge, we take the agency and its representatives at the statements they've made, the public statements they've made, where they've talked about these products are less harmful. And that's the real rub here. But you don't have any evidence that your products are going to induce adults to stop using, that I saw. That's half the equation. Current users. That's the 2300 studies where we talk about the science behind the products. What evidence do you have that existing user, did you present, I really should say, did you present to the FDA, that existing users of tobacco products will stop using such products because they now can turn to your stuff? It's product-specific to us? No. All right. As to the products as a whole, yes, we did. Okay. Distinguishing between flavored and non-flavored. That's what I was looking for. Distinguish between flavored and non-flavored? No, we didn't, because that was not something that we were told we had to do prior to the application deadline. The FDA gave guidance. They made clear, I thought, that they were feeling their way as well. They have to apply the statute. They do. And the statute calls for this sort of comparison. So, I mean, fairly clearly, I think. So why isn't that the end of the case? I mean, I guess you could also say they're being arbitrary if they're being inconsistent. And they were being inconsistent. Did they, were they approving other flavored products? So far, Judge Hamilton, no flavored product from either segment has been approved. Okay. That sounds pretty consistent. The only products that have been approved are tobacco-flavored products, and the ones that have been approved are old technology that really isn't sold much anymore. So it isn't that, but the FDA rationally could say that as to the tobacco-flavored products, the vaping technology poses a lesser risk of harm to the user. So maybe at least the user will cease using combustible cigarettes. It sounds very dramatic, but that's what everybody calls them. And secondly— Actually, you're correct. Say it correctly. I know. I read the record here. Thank you. And the FDA also had some evidence that there are a certain number of adult users who, once they move over to the vaping product, quit altogether. So on the tobacco-flavored things, the public health goal that the statute reflects apparently is being achieved to a significant enough degree that permission is appropriate. The people that use the open system products, relatively few use the tobacco-flavored. They mostly use the flavored products. So this is going to shift everything from one segment to the other. So what's your evidence that adults are going after the flavored products? You say you don't have any evidence that adults are preferring your products to the old combustible cigarette or tobacco flavor. I know that the Farsolino study out of Greece was one of the studies that was cited by Gripham to FDA, and that was a pretty broad study. I think 70,000 users over a number of different foreign countries of adults, and their wide preference was the fruit, especially the fruit flavors, the candy flavors, the sweet flavors. That's predominantly what they used. But see, one study, okay, fine. So there's a study. There were a lot of studies on the other side. Isn't it the agency's job to sift through that and come to a conclusion? Why is it our job? Well, the agency takes the proposition that flavors of the product, adults don't widely prefer flavors. So they're more convinced by that evidence, and perhaps they, as I understand their position, they're also saying that whatever effect the flavored products may be having on the adult population, persuading it to quit, are swamped by the inducement of underage users to begin vaping who never had done it before. Well, I would address the first point that the flavored products far outnumber on the market the tobacco flavored products. They wouldn't be selling if adults didn't prefer them. There wouldn't be a marketplace for them if adults weren't using them predominantly. And as far as the youth use goes, this is why the separation between the market segments is important. Very few youth use the open system products because they are big and clunky. They are expensive. The kids can get the jewels, the very small things that look like a thumb drive, and get them relatively easy. Even at the height of the youth use, kids were not predominantly using the open system products. They were using the jewels. And as FDA concedes, they've moved now to the synthetic products, which we'll be dealing with now with that coming under Congress's FDA's control. So the concern, to circle back to one of Judge Wood's questions, is everybody can look at kind of the market as it exists now or as it existed two years ago. But the FDA says, it has looked at these behaviors, and it finds, in essence, a lack of stickiness among youth and other consumers for particular technologies. And so the assumption is that if flavors are available in any technology, they will draw youth. So why is the court required to accept your view of the market segmentation as rigidly as you portray it? Because, Judge Hamilton, if you look at what's happening in the real world, on the street, when FDA, back in 2020, early 2020, banned the jewel pods, the flavored pods, until they got market approval, kids went to the synthetic products, which were not under FDA's control. The kids did not go to the open system products, which were available. Okay. You're going to have to wrap up. Okay. And, Judge, I would ask the court to vacate the marketing denial order. Thank you. All right. Thank you so much. Yes, Ms. Talmer. Good morning, and may it please the court. Kate Talmer for the Food and Drug Administration. My colleague just acknowledged that Grippem's application did not make a showing that flavored products or its own products have a greater benefit to adults than tobacco-flavored products. And that is the case, as presented in our briefs. Grippem failed to submit any evidence in its application demonstrating benefits from its products to adults. So can I ask you a question, though? One of the things I understand Grippem to be arguing is that the FDA told it, told the public at large, that it wasn't necessary to conduct randomized controlled trials on these things or long-term clinical studies. And so they came to you in good faith, you know, with a showing that did not include that sort of thing. And then the FDA said, oh, that's not good enough because you need randomized controlled trials or long-term clinical studies. That's, I think, what the Fifth Circuit called the surprise switcheroo. And so I would like you to address that. Certainly, Your Honor. So Grippem's portrayal of the 2019 guidance is inaccurate in that it isolates certain language without looking at a whole of the guidance that FDA gave to industry. And the Fifth Circuit's opinion, while we do disagree with it, I would just point out that it was on a very accelerated briefing schedule and an emergency motion without the benefit of full briefing or argument. But more importantly, looking at the guidance as a whole, it plainly advised industry that they were going to need robust evidence to demonstrate the benefits of their products outweigh any harms. So just to take a couple of examples. Well, robust evidence is different than longitudinal studies, right? So specifically, like specifically where, you know, you look at it in context of what language should we look at specifically to take, to put it in context? So as an initial matter, Your Honor, the application wasn't denied for failure to include only a randomized controlled trial or a longitudinal study. It was denied for failure to submit any evidence that Grippem's own products have a benefit. But turning to the guidance— So didn't you say any randomized or other significant data? So the FDA had signaled that it was willing to take alternative studies that somehow don't meet the criteria of randomized controlled trials or long-term clinical studies. Yes, Your Honor. I thought that was your answer to this, but you can tell me. Yes, Your Honor. The decisional memo specifically says that it would be possible to demonstrate the required showing with other evidence, and it looked for other evidence but found it lacking. And this is the 2019? Yes, Your Honor. Turning back to Judge Kirsch's question about the guidance, there are numerous statements throughout that show that evidence with respect to a product's own benefits are required. Taking just a couple, at page 13 of that guidance, it says that studies used as a basis to support an application should be relevant to the new product and address with robust rationale acute toxicological endpoints or other clinical endpoints that may relate to long-term health impacts. Just as importantly, the FDA said that while it did not expect that all applicants will need to conduct long-term studies, that possible long-term health impacts could be shown by including existing longer-duration studies with appropriate bridging information, showing why the data is applicable to the new product. And could you define bridging information? Yes, Your Honor. Bridging information would be something to show that general published literature is applicable to the new product. So FDA was specific, saying that if an applicant relies on published literature, that it should be reflecting a same or similar product, and that the applicant should show specifically to FDA whether the published literature was conducted on the same product or a very similar product, and something to show that the findings are applicable to the product that's the subject of the investigation itself. FDA also, and I think this is critical, it told applicants, it is likely that applicants will conduct certain investigations themselves and submit their own research findings as part of their application, and that was due to the limited research on specific e-cigarette products. That's at 12 note 22 of the guidance. So throughout, FDA told applicants, including on page 12, that non-clinical studies alone are generally not sufficient to support a determination. So I don't think that you can look at the guidance here in its entirety and conclude that there was any surprise that an applicant needed evidence that its own products are appropriate for the protection of the public health. Is it correct to say, however, that no flavored products have been approved? No flavored products have been approved yet, but quite a number of flavored products are in further scientific review. Okay. So jury's still out on some of those. Could you address the point made in the petitioner's reply brief that the review of the scientific evidence here took about an hour based on the FDA's internal documents? Yes, Your Honor. I don't think there's any basis to credit that. I think what happens a lot of times with government documents is that there are many drafts, all kinds of deliberative draft documents and work that goes up through various levels of approval, and then it is digitally e-signed by the decision maker. And it may be digitally e-signed at the final draft moment within a relatively short time frame. My draft briefs might be approved shortly before filing, but that doesn't mean I began to work on them that day or that hour. So I think the time frame between two final decision makers e-signing a document is not a reflection on how much work went into it. Is there any issue here about a marketing plan as there was in the Breeze Smoke and White Lion cases before the Sixth and Fifth Circuits? Your Honor, Gripham did not make an argument that FDA's decision should be reversed for failure to analyze its marketing plan, and its brief doesn't even address its marketing plan. So that's not an issue before the court. There was significant discussion when my colleague was speaking a few minutes ago about the comparative standard, what the closing counsel called the comparative efficacy standard. I think it's important that in the 2019 guidance at pages 13 through 14, it's specifically recommended that applicants compare the risks of a product to those within the same category or subcategory and those in different categories. It's stressed that comparison of a product's risks and benefits is an important part of time, and that an applicant should explain its rationale in selecting the products that it compares its own product to. So applicants were certainly on notice that comparative data would be required, but it granted some flexibility in the applicant to devise what is an appropriate comparator. Now, Gripham's counsel said this morning, as in its briefs, that FDA is requiring an applicant to show that its flavored products are more beneficial than its tobacco flavored products. That's not correct. What FDA has shown is that tobacco flavored products do not pose the same risks to youth, and so it's just looking for evidence that a flavored product is more beneficial than tobacco flavored products are due to their increased harm. Gripham's argument before this court, similar to its briefing, relies on the proposition that e-cigarettes in general may help adults quit smoking. That's the entire justification it put forward to FDA, and it put forward in its arguments here. If that premise were correct, that would require FDA to approve all e-cigarette applications because they would, under that argument, all be showing the same types of benefits. That's contrary to the statutory command, and both the statute itself and the guidance are very clear in saying that FDA needs to make a product-specific determination. So how specific? We could do this at a sort of gross level and say, well, there's tobacco flavor and there's other flavors. I guess most of them are sweet. And then you could say there are the closed system and the open system types. Do we need to go beyond? I mean, we have pages upon pages in microprint of different products that Gripham was proposing and others, if you take Gripham's numbers, there are just countless others, millions out there. So do they all have to be tested? Is some grouping okay? It may be that products can be shown to have similar enough characteristics that some grouping would be appropriate. That's not what we have here because there wasn't any testing or any evidence whatsoever to these specific products. But FDA has not said that each and every millions of products that are on the market need their own randomized control trial. But they've left it up to applicants to be able to design trials, to design evidence, to submit evidence that would support the showing. And they may be able to provide a rationale. And I think that the guidance reflects that in encouraging applicants to explain the rationale for the way they tested their products and the type of comparators that they used. In fact- So we're being told that back in around 2013 or 14, the FDA proposed a complete ban on flavored products. That was held up in OMB. The rule was not issued that way. And that it's unfair and somehow unlawful for the FDA to effectively achieve the same result today by a series of adjudications rejecting all flavored products for insufficient showings. Could you address that point? Yes, Your Honor. It's factually inaccurate to say that FDA is achieving the same result here through adjudications. At this point, there are numerous products that have proceeded to further scientific review. That's because they submitted the type of evidence that could be sufficient to make the required showing. FDA is evaluating whether the evidence and the testing on those products actually does make the required showing. But there are a number of manufacturers whose evidences have been found sufficient to proceed further. So it's not a de facto ban. And at this point, not yet anyway, but at this point, those manufacturers whose applications are under review are still allowed to market their products, correct? Your Honor, none of the manufacturers are allowed to market their products in terms of them being lawful. But they're operating under an exercise of enforcement discretion. Okay. So, but they are on the market. They're making money. In the Sixth Circuit, you probably can't, right? You can't market flavored products at this point? In the Sixth Circuit, well, I think it comes down to whether there's an exercise of enforcement discretion for a particular manufacturer. Yeah. The Breeze Smoke, which is the case that was cited in our briefs, that manufacturer withdrew its petition for review. So that manufacturer does not have an exercise of enforcement discretion at this time. So if there really is a ban, isn't that the sort of thing that needs to go through notice and comment rulemaking? Your Honor, if FDA were to determine that flavored e-cigarettes are banned full stop, that is something that it could accomplish through notice and comment rulemaking. But that isn't what it's done here. What it's done is faithfully apply the statutory standard, which does require a balancing of risks to youth versus benefits to adults. And so far, it hasn't found a flavored product has made that showing. But again, several of them are being evaluated in the advanced phases of the process. And so it hasn't achieved a de facto ban. And in fact- So you're basically saying you're entitled to the same discretion that the National Labor Relations Board gets. They proceed by adjudication, in their case invariably. And you're saying that you have that option? FDA does have the option of proceeding by adjudication. And I think what it did here was it's looking for evidence to see whether e-cigarettes, including flavored ones, do provide a benefit to adults. It is the case that flavored products have a larger market share than tobacco-flavored products. And it may be possible that some manufacturer may show that their products that are flavored or some of their flavored products are more beneficial to adults than tobacco-flavored products are. That showing hasn't been made yet. So what FDA has done is wait and see. Is more beneficial means that you're quitting, or does it just mean that if you switch from combustible cigarettes to a vaping product, at least maybe you're not coating your lungs with tar? It's cigarette reduction. And so an individual could be a dual user but smoke considerably fewer cigarettes than it did before it picked up an e-cigarette. And that could be a benefit. And that's one of the important points, is that showing a benefit to adults is not product efficacy, the way that GRIPM charges. What FDA is looking for is just showing that the flavored products prove more beneficial to adults, including among adults who have no interest in ceasing their tobacco use altogether. It's like a measure of the product's attractiveness to smokers and whether they provide an incremental benefit. And what's critical here is that this is not a close case. GRIPM, as counsel acknowledged, did not attempt to submit evidence that was specific to its products and made the required showing. And I just don't think there's any way to look at the 2019 guidance and conclude that that could possibly meet the standard. The doctors who submitted an amicus brief in support of GRIPM suggest, in essence, I think they called it post-marketing surveillance, which sounded to me like conducting a nationwide experiment. Let these products go out on the market and then let's see what happens. I appreciate thoughts from both counsel, but I'm looking at this, in essence, as a problem of governance in the face of uncertainty, scientific uncertainty and consumer behavior uncertainty. And I tend to read the statute as saying the presumption is no approval until you make an affirmative showing to get past this uncertainty and show us reason to think there really will be a health benefit, net benefit. Yes, Your Honor. I think Amiki's argument is easily answered by the statute. The statute directs the secretary shall deny an application unless the required showing is made. So the fact that FDA has exercised some enforcement discretion while it allowed manufacturers to prepare and submit these applications doesn't warrant doing so in perpetuity. I assume you're getting pressure from health groups saying, why are you exercising this kind of enforcement discretion? I think that for a number of years, public health groups have wanted FDA to take certain actions. But what FDA has done here is look at the evidence. It found serious risks to use from flavored products and acted accordingly. I would like to briefly mention that the bottled e-liquids that are sold by GRIPM and some other manufacturers, they're not used only in large tank devices. There are also refillable pod devices that can be used. And in the decisional document, FDA specifically found that, as Your Honor pointed out, there's a high elasticity of demand among youth. Because when certain flavored products stepped up enforcement, made their availability go down, youth didn't start using tobacco-flavored products in the same preferred devices. And they didn't stop vaping. They switched to different devices that allowed the desired flavors. So FDA reasonably found that youth use really is driven by demand. Okay. Thank you very much. Thank you. I think you were either out of time or low on time. But I will give you a minute to rebut. If youth were the key here, products like Juul should have been an absolute slam dunk to getting the first market denials. The fact that they're still being looked at is, to me, is an issue. As to the tobacco product standard issue, Judge, under Section 907 of the TCO, specifically 907A4B, anything involving testing of a tobacco product is considered part of the tobacco product standard, which has to go through notice and comment rulemaking. FDA is still, just in December, issued its guidance, or its proposed guidance, asking for public comment with regard to its testing analytics. We're not even to the point yet where you could start the testing. The FDA is still searching this out. And this is part and parcel of the problem of what we got. I'm not trying to litigate the Maryland case again, even though I disagree with Judge Grimm's ruling. That has colored a lot of where we are. And as far as the testing goes, we were going to have to do control testing during COVID when we couldn't actually get to people. All right. That's my point. And I appreciate the court's time. Thank you. Thank you so much. Thanks to both counsel. The court will take this case under advisement.